FRY & CO. v. FORD.

1. PRACTICE IN SUPREME COURT: *Bill of Exceptions; Instructions.*
   Unless the ruling of the Circuit Court, in giving or refusing instruc-- tions, be excepted to and made ground of the motion for new trial, it cannot be reviewed in the Supreme Court.

2. LANDLORD: *His rights in crop as against Mortgagee.* ·
   When a tenant abandons his crop and fails to perform the terms of his. lease, the landlord may gather, gin and bale the cotton cultivated by him and take out of it and retain against the tenant's mortgagee of the crop, the expenses of preserving it from waste and preparing it for market, as well as the rent.

APPEAL from *Chicot* Circuit Court.

Hon. T. F. SORRELLS, Circuit Judge.

*Valentine,* for appellants:

The court erred in refusing the second instruction for plaintiffs. *Upham* v. *Dodd,* 24 *Ark.,* 545 ; *Robinson* v. *Kruse,* 29 *Ib.,* 575.

The second instruction for appellee should not have been given. If there was an agreement that Ford should take the cotton, and he and Fry & Co., and Robinson should share it according to their respective rights, then Ford had the right of election to account for it, to return it to the mortgagees, or keep it himself ; and so long as the matter

was in abeyance, the action did not accrue.   16 *Ark.*, 104 ;
20 *Ib.*, 583.

If there was no agreement, Ford was either a bailee for
Fry & Co., and held subject to their rights, or a purchaser,
and no right of action accrued until demand and refusal.
Ford was not a purchaser, because no price was agreed on.

*Pindall*, for appellee :

The crop having been abandoned, the landlord had a right
to re-enter.   1 *Wash. Real Est.*, 479 ; and having aban-
doned before severance from the soil, the tenants never
acquired a legal estate in the crop, and their mortgagees had
no greater interest.   If plaintiffs acquired any interest, they
took subject to the landlord's lien, which was superior to
the mortgage.   The landlord was entitled to rent, mule-
hire, expenses of gathering and advances procured from
Ford for them.   *Hamlett* v. *Tallman & Graves*, 30 *Ark.*,
505 ; *Acts* 1875, 330, *March* 6, 1875.

Plaintiffs had full notice, as Fry copied one of the con-
tracts.

The bill of exceptions does not show that objections were
made to the two instructions for defendant.   *Johnson* v.
*Terry*, 35 *Ark.*, 224.   The second, for plaintiff, properly ·
refused.   *Hamlett* v. *Tallman, etc., supra.*

The evidence shows that the action was barred, and this
court will not disturb the verdict on the mere weight of evi-
dence.

ENGLISH, C. J.   This action was commenced in the Cir-
cuit Court of Chicot county, on the eighth of December,
1879, by Reuben M. Fry and Mark Valentine, merchants
and partners, under the firm name of R. M. Fry & Co.,
against William W. Ford.

The complaint alleged, in substance, that on the seventh of March, 1876, certain Chinamen, named John Fung, Boc. Year, A. Moun, A. Sing, A. Young, A. Hook, Chin Jack and Bow Sing, for and in consideration of the sum of $26.60, which they then owed plaintiffs, for money and goods, as well as for the further consideration of goods, wares and merchandise, thereafter to be furnished them by plaintiffs before the first of February, 1877, executed a mortgage, by which they transferred to plaintiffs all their interest, of every kind and nature whatsoever, either as the same was then held by them, or as it might thereafter be acquired, in a crop of cotton then being raised by them on the Drennondale plantation, on Chicot lake, in Chicot county, Arkansas. That said mortgage was duly acknowledged and filed for registration in the recorder's office of Chicot county, twenty-sixth of March, 1876, and recorded, etc. That by reason of said mortgage, and the security therein given, plaintiffs advanced to said mortgagors, in money, goods, etc., previous to the first of February, 1877, the sum of $178.47, which, with interest, remained due and unpaid to them.

That on said seventh of March, 1876, certain other Chinamen, named Henry Gibson, Charley Chow, Wang Wing, Johnnie Join, Ju Wah, Wong Shu, John Fook, John Join and Young Dick, for and in consideration of the sum of $126.37, for money advanced, and goods, etc., theretofore sold to them by plaintiffs, as well as for the consideration of further advances of money, goods, etc., thereafter to be furnished them by plaintiffs, previous to first of February, 1877, executed to plaintiffs their certain deed of mortgage, by which they bargained, sold and conveyed to them their entire interest, of every kind and nature whatsoever, in a certain crop of cotton then being raised by them on the Drennondale plantation, on Chicot lake, etc. That said

mortgage was duly acknowledged, and on the twenty-fifth March, 1876, filed for registration in the recorder's office of Chicot county, and recorded, etc. That by virtue of said mortgage, and the security therein given, plaintiffs advanced to said mortgagors, in goods, etc., previous to first of February, 1877, the sum of $238.65, which, with interest, was due and unpaid to them.

That said mortgagors raised on said Drennondale plantation, during said year, 1876, an amount of cotton more than sufficient to pay the plaintiff's mortgaged indebtedness thereon, and that William W. Ford obtained possession of said cotton so mortgaged to plaintiffs, to an amount more than sufficient to pay off said indebtedness, and afterwards, to-wit: on the second day of February, 1877, converted the same to his own use, and refused to account to plaintiffs for said cotton, etc.

Prayer for judgment against defendant for said sum of $178.47, and for said sum of $238.65, with interest, etc.

Defendant answered, in substance, that he was a merchant doing business at Lord's landing, Chicot county, and furnished supplies to planters, etc. That early in the year 1876, James F. Robinson, then owner of the Drennondale or Durfield plantation, arranged with defendant to furnish supplies to him, and on his account and personal credit, for the hands on that plantation. That for the convenience of himself and Robinson, accounts were kept against the laborers so furnished on the books of defendant, by names, though the accounts were really against Robinson, and so regarded, treated and understood by him, the laborers and defendant. That all the supplies so furnished to laborers or tenants on said plantation, except Lucas Welchman and William Johnson, were, during the year 1876, furnished under said agreement with Robinson.

That among the hands so furnished by defendant were

certain Chinamen, being the same, as defendant was inform-
ed, as mentioned in the complaint.   That he received from
Robinson a large amount of cotton raised on said plantation
during the year, 1876, in way of payment on said accounts
for supplies so furnished him during that year.   That all
the cotton, so received from Robinson, was credited to him,
there being no credit account kept with any of the laborers
or tenants so furnished at the request of, and through and
for Robinson as aforesaid.   That the cotton received from
Robinson for his said account, as aforesaid, according to the
recollection of defendant, was all received prior to the first
day of December, 1876.   That the gin-house of Robinson
was burned in November, of that year, and defendant
received no cotton from him after the burning of the gin-
house, except four bales, received on the fifteenth Febru-
ary, 1877, three of which were raised by said Wm. John-
son, and defendant did not know who raised the other bale.
Denies that he received any other cotton so raised on said
plantation on the second day of February, 1877, or at any
other time thereafter—neither the cotton raised by said
Chinamen nor any one else—under the arrangement afore-
said with Robinson.   Denies that he received any cotton
raised by said Chinamen at any time within three years next
before the bringing of this suit, and sets up the Statute of
Limitation of three years as a bar to the recovery of the
value of any of the cotton so received by him from said
Robinson, that may have been raised by said Chinamen on
said plantation, during the year 1876.

The case was submitted to a jury on the above pleadings,
evidence introduced by the parties, and instructions of the
court; the jury returned a verdict in favor of defendants;
the plaintiffs moved for a new trial, which was refused.
There was a final judgment discharging defendant, and
plaintiffs took a bill of exceptions, and appealed.

Fry & Co. v. Ford.

I. It was made ground of the motion for a new trial that the court erred in giving two instructions for defendant. The bill of exceptions states that the defendant asked the court to give two instructions as the law of the case, which are copied, and then states that the court gave them, and this is all that is said about them in the bill of exceptions. It is not stated that plaintiffs objected to them, or excepted to the ruling of the court in giving them.

<span style="float:right">1. PRAC-<br>TICE IN<br>SUPREME<br>COURT:<br><br>Bill of ex<br>ceptions:</span>

When the court gives instructions objected to, or refuses such as are asked, it is the proper and settled practice to except to the ruling of the court, and make it ground of the motion for a new trial, in order to have it reviewed on appeal or writ of error. *McKenzie* v. *State*, 26 *Ark.*, 342 ; *Cheatham* v. *Roberts*, 23 *Ib.*, 651 ; *Berry* v. *Singer*, 10 *Ib.*, 483 ; *Benton* v. *State*, 30 *Ib.*, 336 ; *Henry & Co.* v. *Gibson, et al*, 26 *Ib.*, 519 ; *Peterson* v. *Gresham*, 25 *Ib.*, 383.

<span style="float:right">Instruc-<br>tions.</span>

II. A further ground of the motion for a new trial was, that the court erred in refusing to give the second instruction moved for plaintiffs.

<span style="float:right">2. LAND-<br>LORD:<br>His rights<br>to crop as<br>against<br>mortgagee<br>of tenants.</span>

The bill of exceptions shows that the plaintiffs asked three instructions; that the court gave the first and third, and refused the second, and that plaintiffs excepted to the ruling of the court in refusing it.

The instruction refused follows : ''The contracts introduced in evidence, by defendant, between Mary P. Robininson and the Chinamen who mortgaged to plaintiffs, have no other effect than to prove that the relation of landlord and tenant existed between Mrs. Robinson and said Chinamen, and are not to be considered as conveying to Mrs. Robinson any other right as against plaintiffs, than the right to enforce her statutory lien for her rent, provided she does the same in the time and manner required by law.''

It appears from the evidence that James F. Robinson cultivated the Drennondale plantation in the year 1876, and he and other witnesses examined, spoke of it as belonging to him; but it seems that the rent contracts made between him and the Chinamen were, for some reason not explained, and about which no question was made in the court below, signed by Mrs. Mary P. Robinson, as lessor, and the Chinamen as lessees.

James F. Robinson testified that the Chanamen, who executed the mortgages read in evidence by plaintiffs, worked on his place in 1876, under written contracts which were filed and endorsed under the Statute, but not recorded, and that they were lost and could not be found. The recorder also testified that they could not be found in his office, and defendant then read in evidence the entries made by the recorder in the index, and proved by James F. Robinson the contents of the contracts. He stated that there were two or three, or perhaps more, of the written contracts, and they were all alike as to terms, he thought. They leased, in all, about one hundred and fifty acres of land, and provided for rent at $10 per acre, and for rent of mules and implements. He thought they provided for a lien for the rent. Did not recollect whether a lien for supplies was reserved in them or not, but thought it was, as he usually wrote his contracts in that way.

From the indications in the recorder's index, read in evidence, they were filed before the execution of the mortgages read in evidence by plaintiffs.

R. M. Fry testified that about the time he took the mortgages from the Chinamen he examined their lease contracts on file in the clerk's office. There were three of them, he thought, all alike as to the terms of lease. He read them all, and, fearing they might be lost or mislaid, he afterwards

made a copy of one of them, which he got the clerk to certify. The others were exactly similar as to terms.

Plaintiff then read in evidence this copy. It is dated twenty-ninth February, 1876, and purports to have been executed and acknowledged on the same day, by Mrs. Robinson as lessor, and the nine Chinamen named in the complaint as having made the second mortgage therein described. It appears to have been filed in the recorder's office and indexed March 2, 1876. By it, the lessor, in consideration of the covenants and agreements thereinafter mentioned, to be kept and performed by the lessees, etc., demises to them a part of the Durfield plantation described, containing seventy-five or eighty acres, more or less, from the date of the lease to the first of January, 1877. The lessees covenant, on their part, to pay $10 per acre rent for said tract of land and any other land they may work on said plantation, the same to be paid out of the first cotton said lessees may pick and gin off said tract of land, to be paid or delivered on or before the first day of November, 1876, at the gin-house on the plantation. The lessor agrees to give them the use of the gin free of charge, they paying engineer and pressman, and furnishing their own wood. They also agree to pay $20 per head for any mules they may rent from the lessor, to be paid at the same time and place as the rent of land, etc. The lessor also agrees to let the lessees have the use of necessary farming implements, including a wagon; the mules, implements, and wagon to be kept in good order and repair by them, and returned, etc. Also the privilege to cut from the back of the plantation necessary fuel for the use of their houses and to gin with. The lessees agree not to sublet or assign their lease without the consent of the lessor, and to surrender possession of land and houses occupied by them on the first of January, 1877, with the understanding that they may thereafter until first of Febru-

.ary of same year gather any of their crop not picked by the first of January.

Such is the substance of the contract of lease read in evidence by plaintiffs, and it seems the other contracts were like it as to terms.

R. M. Fry also testified that James F. Robinson was planting on the Drennondale plantation and told him he had a number of Chinamen on the place, and at his urgent request he agreed to supply them. Robinson was so enthusiastic about the benefits of Chinese labor that witness believed he would have released his lein to him if he had asked it. He agreed, however, to supply them, and took from them the two mortgages described in the complaint. He supplied them until the overflow came in April, to the amount named in the complaint, and bills of particulars attached. During the overflow, Henry Gibson's squad came to him and wanted thirty-six barrels of rice at one time; he refused to let them have so much. They got mad and never came after any more supplies, except, perhaps, a few little articles. He never refused to supply them to a reasonable extent.

It was in evidence that when plaintiffs quit furnishing them, James F. Robinson made the arrangement with defendant Ford to furnish them with supplies on his personal credit, as stated in his answer.

It was also proved that the Chinamen abandoned their crop before the picking season commenced, when the cotton began to open, and that James F. Robinson had their cotton gathered, ginned, baled and prepared for market. He testified that he paid the expenses of picking, ginning, and baling the cotton, which cost about one-third of its value, and that there was not enough of the cotton to pay the rent and the expenses of preparing it for market.

Mrs. Robinson seems to have been a mere nominal party to the lease contracts made by her husband, James F.

Robinson, with the Chinamen. He no doubt was the planter, and in the management and control of the Drennondale or Durfield plantation.

Appellants took their mortgages from the tenants subject to the rights of the landlord under the lease contracts. Upon every principle of justice, after the Chinamen abandoned the crop, and failed to comply with the terms of their contracts, Robinson had the right to gather, gin, bale and prepare for market the cotton cultivated by them, and so abandoned in the fields at the commencement of the picking season, and to take out of it the expenses of preserving it from waste, and preparing it for market, as well as the rent.

*When tenant abandons crop, landlord may gather, etc.*

Upon the facts in evidence the court did not err in refusing the instruction above copied.

III. It was made a further ground of the motion for a new trial, that the verdict was contrary to law and evidence. Under this assignment may be noticed the defense of the Statute of Limitation set up in the answer of appellee.

The action is in the nature of the common law action of trover. The gist of the complaint is that plaintiffs had title as mortgagees to cotton which came to the possession of defendant, and by him converted to his own use.

Of course the Code pleader tells the whole story, alleging not only principal facts, but also setting out matters of evidence. The complaint and answer were drafted in that way, which is common among Code pleaders, though not in accordance with the views of commentators on Codes.

The court instructed the jury, on motion of plaintiffs, "that to maintain the action they must prove, 1st, ownership in the cotton in controversy, either general of special; 2nd, that it was converted by defendant to his own use within three years next before the bringing of this suit, that is, since the eighth day of December, 1876; and 3rd,

that the value of the property was equal to the amount claimed by plaintiffs, and if the jury believed from the evidence that plaintiffs had valid and duly recorded mortgages upon said property, and that it was converted by defendant, and was worth as much as plaintiffs' claim, they must find for plaintiffs, unless defendant proved title in himself superior to theirs.''

James F. Robinson testified that after he picked, ginned, and baled the cotton raised by the Chinamen, he delivered about seventeen bales of it to defendant, Ford. That he delivered it to him before his gin was burned, (about the twenty-fourth of November, 1876,) in payment of the debt he owed him for supplies.

Defendant testified that he considered the cotton his from the time Robinson delivered it to him.

Plaintiffs' mortgages were upon record, and there are indications in the evidence that defendant in fact knew before, and at the time Robinson delivered the cotton to him in payment of his debt, which was more than the value of the cotton delivered, that plaintiffs had taken the mortgages from the Chinamen. Defendant purchased the cotton regardless of the claim of plaintiffs, and treated it as his own from the time of the purchase. What became of the cotton afterwards is not disclosed by the evidence.

Upon the facts in evidence the jury were warranted in finding that defendant converted the cotton to his own use by purchasing it from Robinson, and at once treating it as his own property, which was more than three years before the commencement of the suit. 2 *Greenleaf on Evidence,* (*Redfield Ed.,*) sec. 642.

Appellants attempted to show that appellee deluded them into a delay of suit by making the impression upon them that he would have a settlement with them about the cotton, but nothing was proved that would legally prevent the run-

ning of the Statute, or remove the bar. They also claim that Robinson acted in bad faith with them about the gathering and disposal of the cotton cultivated by the Chinamen, but this is not a suit between appellants and him.

Nor need we enquire, in this case, whether Robinson should have filed a bill in chancery against the Chinamen, after he gathered and baled the cotton abandoned by them, to enforce the payment of rent and expenses incurred in preserving it, and preparing it for market. If he had no right to sell the cotton to appellee, and was a wrong-doer in selling it, it only made a strong case of conversion by appellee, and a clearer defense under the Statute of Limitation.

Upon the record the judgment must be affirmed.